IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | * | CHAPTER 11 |
| LIGHTSTYLES, LTD., | * | |
|     Debtor-in-Possession | * | |
| | * | CASE NO. 1:12-bk-03711 MDF |
| LIGHTSTYLES, LTD., | * | |
|     Movant | * | |
| | * | |
| v. | * | |
| | * | |
| SUSQUEHANNA BANK, successor | * | |
| in interest to GRAYSTONE TOWER | * | |
| BANK, | * | |
|     Respondent | * | |

## OPINION

Before the Court is the Motion of LightStyles, Ltd. ("Debtor") for the use of cash collateral (the "Motion"). Susquehanna Bank, (the "Bank") filed a response requesting that the Court deny the Motion or authorize the use of cash collateral only to the extent that Debtor provided the Bank with adequate protection of its rights. The Bank holds a security interest in all of Debtor's assets other than motor vehicles, including assets that constitute cash collateral as defined in 11 U.S.C. § 363(e). An emergency hearing was held on July 9, 2012 after which the Court entered an interim order permitting Debtor to use cash collateral and directing Debtor: (1) to pay the Bank $20,000 by July 16, 2012; (2) to maintain its accounts at the Bank; and (3) to provide the Bank with certain reports that would allow it to monitor Debtor's operations. A final evidentiary hearing was held on July 23, 2012 at which time the Bank renewed its objection to the further use of cash collateral.[1]

---

[1] I have jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is core pursuant to 28 U.S.C. § 157(b)(2)(A),(B), and (O). This Opinion constitutes findings of fact and conclusions of law made under Fed. R. Bankr. P. 7052, which is applicable to contested matters pursuant to Fed. R. Bank. P. 9014.

## I. Background

Debtor is a distributor of windows, doors, and hardware for both residential and commercial construction. In about September 2011, Marvin Windows and Doors ("Marvin") terminated a distributor agreement with Debtor. Prior to the termination of the agreement, Debtor was generating approximately $30 million in sales annually with the sale of Marvin products constituting approximately 80% of Debtor's revenues. Unsurprisingly, Marvin's action dealt a major blow to Debtor's business. Debtor attempted to obtain other window and door lines, but was unable to generate sufficient income from the sale of other products to cover its operating expenses, let alone fully service its debt to the Bank.

In May 2012, the Bank accelerated various loan agreements and demanded that Debtor immediately pay all amounts due. The Bank confessed judgment against Debtor in June 2012 and also began collecting accounts directly from Debtor's customers. In response to the Bank's collection activities, Debtor and an affiliate corporation, Marvin Window & Door Showplace, Inc., filed petitions under Chapter 11 of the Bankruptcy Code on June 22, 2012.

When Debtor filed its petition it had four outstanding loans with the Bank with a total amount due of approximately $13,380,000 (the "Loans"). According to Debtor's schedules, cash collateral comprises a bank account with a balance of $130,805 and the proceeds of accounts receivable in the amount of $5,843,024 and of inventory in the amount of $1,941,582. The Bank has a perfected security interest in Debtor's remaining assets valued by Debtor at approximately $5.4 million[2] except for vehicles that Debtor has valued at $125,523. Under the terms of the

---

[2]As I will discuss below, the Court believes that the values of the non-cash assets reported in Debtor's schedules are inflated. For example, on Schedule B, Debtor lists "notes receivable" valued at approximately $2.7 million. These notes are agreements obtained from

2

Loans, Debtor is obligated to make payments of $57,924.25 per month. These payments are interest only on three of the loans and interest and principal on one loan with an outstanding balance of approximately $465,911. Prior to filing for bankruptcy relief, Debtor had failed to make the contractual payments on the Loans for at least four months.

At trial, the Bank introduced Debtor's balance sheet for the period ending May 31, 2012 and an income statement for the same period that also included year-to-date numbers. On the balance sheet, Debtor reported total assets of approximately $10.1 million and total liabilities of $15.5 million. Of the $10.1 million in assets, $2.7 million were notes receivable from customers who had delinquent accounts. Therefore, the amounts due under the notes are duplicated in the reporting of accounts receivable. When these values are adjusted, total assets as of May 31, 2012 probably did not exceed $7.4 million. The income statement for the period ending in May showed a net operating loss of $126,739 for the month and a year-to-date loss of $655,133. During the same five-month period Debtor made payments on debt service totaling $69,504.32

---

customers to repay invoices that the Court believes also are included in accounts receivable. Only one recovery on an account may be obtained, therefore, the notes do not add further value to Debtor's balance sheet. Also, the evidence introduced at the hearing did not support the existence of eight promissory notes as reported by Debtor. Although eight notes were listed on the balance sheet, Debtor's Exhibit 3 only referred to possible notes from four vendors. The promissory note from Windows & More was unsigned and the promissory note from Woodtech, Inc. was signed but unsecured with no personal guarantee attached. Only the note from Window & Door Showplace was signed and included personal guarantees. Correspondence between Debtor and J.M. Browning, Inc. did not establish that a promissory note from this customer had been obtained. After adjusting the scheduled value, the Court finds that, rather than $5.4 million, a more realistic value of non-cash collateral held by Debtor securing the Bank's loans is approximately $2 million. Further support for this proposition is found on Debtor's balance sheet for May 31, 2012, which reports property and equipment valued at $98,284 net of depreciation.

3

to Orrstown Bank and to the Bank.[3] During this same period the total payments due to the Bank on the Loans was $289,621.25.

At the July 23 hearing, Debtor offered as adequate protection: (1) the contractual monthly payment on the Notes of $57,924.25 beginning August 2012; (2) one-half of the accounts receivable that the Bank was collecting directly from Debtor's customers before the petition was filed; (3) titles to vehicles in which the Bank did not have a pre-petition perfected security interest; and (4) promissory notes from delinquent customers. Debtor also asserted that the Bank held additional security for the Loans through guarantees executed pre-petition by Debtor's principal and his spouse. The guarantee executed by the spouse of Debtor's principal is secured by an interest in real estate located at 1261 Claremont Road, Carlisle, Pennsylvania. Debtor valued the property at $1.4 million, but the testimony offered as to the amount of equity available to secure the Loans was indefinite. Likewise, property located at 419 East High Street, Carlisle, Pennsylvania, owned by Debtor's principal and valued by him at $1.1 million is subject to the Bank's liens, but inadequate evidence was presented from which the Court could determine that there is equity available to secure the Loans. The Bank rejected Debtor's offer of adequate protection arguing that it failed to protect the Bank's interest in Debtor's assets that served as collateral for the Loans.

## II. Discussion

Under § 363(c)(2), a debtor may not use cash collateral unless consent is obtained from creditors that have an interest in the collateral, or the bankruptcy court authorizes its use. If the

---

[3] Debtor was unable to state how much of the total of $69,504.32 was paid to the Bank and how much was paid to Orrstown Bank.

creditor does not consent, cash collateral may be used by the debtor only to the extent that the court determines that the creditor's interest in the collateral is adequately protected. 11 U.S.C. § 363(e). Adequate protection is not defined in the Bankruptcy Code, but § 361 provides three non-exclusive methods as examples: (1) periodic cash payments; (2) additional or replacement liens; or (3) other relief resulting in the "indubitable equivalent" of the secured creditor's interest. When devising a proposal for adequate protection of a secured creditor's interest, the proponent "should as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights." *In re American Mariner Industries, Inc.*, 734 F.2d 426, 435 (9th Cir. 1984) *quoted in In re Swedeland Development Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994).

A bankruptcy court should apply the following standard when determining whether a debtor should be permitted to use cash collateral:

> (1) The court must establish the value of the secured creditor's interest; (2) The court must identify risk to the secured creditor's value resulting from the debtor's request for use of cash collateral; and (3) The court must determine whether the debtor's adequate protection proposal protects value as nearly as possible against risks to that value consistent with the concept of indubitable equivalence.

*Martin v. United States (In re Martin)*, 761 F.2d 472, 476-77 (8th Cir. 1985). When a debtor seeks the use of cash collateral, it has the burden of proving that its proposal adequately protects the creditor's interest. 11 U.S.C. § 363(p)(1).

In addition to reviewing the debtor's adequate protection proposal, the court should consider whether there is any reasonable chance of reorganization. If a debtor is engaged in an obviously futile attempt to reorganize, it should not be permitted to jeopardize a creditor's cash collateral. *In re C.F. Simonin's Sons, Inc.*, 28 B.R. 707, 711 (Bankr. E.D.N.C. 1983). *See also*

*Sharon Steel Corp. v. Citibank, N.A.*, 159 B.R. 165, 172 (Bankr. W.D. Pa. 1983) (holding that debtor could not use cash collateral although objecting creditors were oversecured when business plan was unrealistic and unattainable).

Debtor and the Bank agree that Debtor owes the Bank approximately $13 million. According to Debtor's schedules, on the date the petition was filed, Debtor held cash, accounts receivable and inventory of approximately $8.4 million. At the July 23 hearing, the Bank's witness testified that the value of the collateral securing the Loans was between three and five million dollars. He also testified that the value of other assets owned by Debtor securing the Loans, including equipment, did not exceed $500,000. The Court finds these assessments of value to be credible. Therefore, the Bank's interest in Debtor's collateral is undersecured and any diminution in the value of the collateral will result in a loss to the Bank unless its interests are adequately protected. Debtor is continuing its operations and intends to use one-half of pre-petition accounts receivable as they are collected, and presumably all post-petition receivables, to fund its operations.[4] Therefore, the Bank's interest in pre-petition accounts will continue to shrink and its position will be impaired unless other security is provided or the balance of the Loans is reduced commensurately.

Debtor's offer of adequate protection is insufficient. First, the Court is unable to determine whether or not the contractual monthly payment of $57,924.25 on the Loans provides adequate protection because the source for this payment was not specified. If the payments will be made from pre-petition accounts receivable, then no additional protection to the Bank is being

---

[4] Debtor has not offered to give the Bank replacement liens in post-petition accounts and inventory.

6

Case 1:12-bk-03711-RNO    Doc 41    Filed 07/27/12    Entered 07/27/12 14:48:31    Desc
Main Document    Page 6 of 8

afforded. Most of the payment is applied to interest and not to the reduction of principal. However, if the payments were made from post-petition accounts not subject to the Bank's lien, these payments would constitute additional protection to the Bank. Second, permitting the Bank to retain half of the accounts it has collected is not adequate protection. Rather, from the creditor's perspective, retention by Debtor of half of the accounts receivable is the dissipation of collateral. Third, Debtor's proposal to transfer the titles to vehicles in which the Bank did not have a pre-petition perfected security interest does provide additional protection to the Bank's interest. However, the amount of protection afforded is small. Debtor's schedules report a book value for the vehicles of approximately $125,000. Considering the age of some of the vehicles, they probably should be valued at less than $100,000. This value is not substantial when compared against Debtor's budget and the rate at which cash will be expended. Finally, as discussed above, the Court does not believe that the promissory notes from some customers offer any additional adequate protection to the Bank.

 Although not directly offered as adequate protection, Debtor has asserted that the Bank will be protected by increased revenues from the business during the next six months. Debtor has obtained a new agreement to provide distribution services to a major manufacturer. Because he was bound by a confidentiality agreement with the new company, Debtor's principal was unable to disclose its identity at the July 23 hearing, but he stated that he would be meeting with the manufacturer over the next few weeks to prepare to launch this new line. Based upon this potential for increased sales, Debtor's principal stated that he expected Debtor's sales to double from current levels in the second half of 2012 and then triple from current levels in 2013. Therefore, Debtor expects to go from a net loss of $655,133 for the first five months of 2012 to a

7

Case 1:12-bk-03711-RNO Doc 41 Filed 07/27/12 Entered 07/27/12 14:48:31 Desc
Main Document  Page 7 of 8

net profit by year's end.

In *Swedeland*, the Third Circuit cautioned that adequate protection requires more than an opportunity to recoup a creditor's loss of collateral through the potential success of a speculative business venture. *Swedeland*, 16 F.3d at 567. Debtor's projections for the next six months are highly speculative. Without more information about the timing of the new distributorship and more concrete data supporting Debtor's rosy sales projections, the Court is unable to find that this new relationship is likely to provide a means to reverse Debtor's current financial course.

Debtor has asked the Court to permit it to use cash collateral without restriction, albeit for a limited duration of thirty days, based on the thinnest of evidence. Had this Court been presented with a more realistic and substantiated proposal to afford protection to the Bank, authority to use cash collateral may have been granted. The current proposal, however, is simply inadequate. Therefore, the Motion to use cash collateral will be denied and the Bank's request to deny the use of cash collateral will be granted. An appropriate order follows.

By the Court,

*Mary D France*
Chief Bankruptcy Judge
(ARP)

Date: July 27, 2012

8